LANIER, Judge.
This is a suit in contract seeking specific performance to compel the purchase of two automobiles. The defendant answered and asserted the obligation was extinguished because its subrogation rights as a surety were impaired by the actions of the plaintiff. The trial court found the contract between the parties did not have a surety accessory promise and rendered judgment in favor of the plaintiff for $28,543.06. This suspensive appeal followed.
FACTS
On December 14, 1982, First Federal Savings and Loan Association (First Federal) and Dan Quirk Ford Company (Quirk Ford), both of Slidell, St. Tammany Parish, Louisiana, entered into a contract entitled a “Non-recourse Dealer Agreement”. The contract states that Quirk Ford is desirous of entering into an arrangement whereby First Federal “will purchase various consumer sales finance contracts ... on a recurring basis” from Quirk Ford and First Federal is also desirous of entering into such an arrangement. Quirk Ford would deliver to First Federal “on a daily basis or at such other intervals as agreed upon by the parties” various contracts to be transferred. First Federal was under no obligation to accept any contract unless approved by it. If First Federal agreed to accept a contract, it agreed to pay to Quirk Ford “a sum equal to the present discounted value of each such Contract ..., plus a percentage of the FINANCE CHARGE to be earned over the term of the Contract.” Quirk Ford agreed to assist First Federal in the collection of any contracts transferred to First Federal. The contract does not contain any obligations by First Federal to notify, or consult or cooperate with Quirk Ford in the collection of any contract. The contract commenced on execution and could be terminated by either party by giving thirty days written notice to the other. Specifically at issue herein is the meaning and legal effect of paragraph 7(e) of the contract, which provides as follows:
When this contract refers to non-recourse Dealer Agreement it is understood that the Dealer is signing recourse until the first three fully paid installments are made to Lendor. Dealer agrees to purchase said vehicle from Lendor, on demand, for an amount equal to the net outstanding balance of said contract, on date of delivery of vehicle to Dealer by Lendor.
On July 2, 1983, David H. Thomas purchased a 1983 Ford F-150 pickup from Quirk Ford under a credit sale contract. The Thomas contract provided for the payment of monthly installments beginning on August 2, 1983, in the amount of $279.73 per month for a period of sixty (60) months. The Thomas contract was acquired by First Federal from Quirk Ford on August 11, 1983.
On July 7, 1983, Pearl N. Kelly purchased a 1980 Cadillac DeVille from Quirk Ford under a credit sale contract. The Kelly contract provided for monthly installments beginning on August 6, 1983, in the amount of $450.08 per month for a period of thirty-six (36) months. The Kelly contract was acquired by First Federal from Quirk Ford on August 15, 1983.
The record does not reflect the exact method by which First Federal acquired ownership of the Thomas and Kelly contracts, whether by blank endorsements or otherwise.
Thomas and Kelly failed to pay First Federal the first three installments due on their respective contracts. On or about April 23, 1984, First Federal repossessed the Thomas vehicle in Arizona. On April 24, 1984, and again on August 8, 1984, First Federal tendered the Thomas vehicle *932 to Quirk Ford and demanded payment of the outstanding balance of the contract of $14,113.62. On or about September 12, 1984, First Federal acquired the Kelly vehicle at a sheriff’s sale in an executory proceeding it instituted. The record does not reflect if the sale was subject to appraisal. On September 27, 1984, First Federal tendered the Kelly vehicle to Quirk Ford and demanded payment of the net outstanding balance of the contract of $14,-493.82. Quirk Ford refused to accept either vehicle and did not pay the outstanding balance due on either contract.
SURETYSHIP
In its sole assignment of error, Quirk Ford contends the “trial court erred in finding that a contract of suretyship was not created under Article 7(e) of the agreement ..In his oral reasons for judgment, the trial judge observed as follows:
I do not consider this arrangement to be a contract of suretyship. This is a contract that was entered into between the dealer and the bank on the front end of any financing arrangement. There was consideration given by the bank in exchange for the dealer’s obligation to purchase back these vehicles as required by Section 7-E. Number one, the bank was agreeing to finance some deals that were not good deals. Number two, the bank was taking this paper without any recourse against the dealer other than that set forth in Section 7-E.
This contract was entered into to provide a method of financing and a means by which a dealer could get financing long before the contracts between the purchaser were executed. There was no purchaser bound at the time Dan Quirk Ford executed this contract with First Federal Savings & Loan Association.
Suretyship is an accessory promise by which a person binds himself for another already bound and agrees with the creditor to satisfy the obligation, if the debtor does not. La.C.C. art. 3035. See, generally, R. Slovenko, Suretyship, 39 Tul.L.Rev. 427 (1965); L. Hubert, The No,ture and Essentials of Conventional Suretyship, 13 Tul.L.Rev. 519 (1939). The distinction between a principal contract and an accessory contract is described in S. Litvinoff, 6 Louisiana Civil Law Treatise, Obligations § 110, p 194 (1969), as follows:
A contract is called principal when it stands on its own. It is called accessory when it is attached to another and principal one. This is the basic idea reflected in article 1771 of the Louisiana Civil Code: ‘A principal contract is one entered into by both parties, on their own accounts, or in the several qualities they assume. An accessory contract is made for assuring the performance of a prior contract, either by the same parties or by others; such as suretyship, mortgage and pledge.’ The first sentence of this article can be better understood in the light of its French text. According to this, what the redactors meant is that a principal contract is one entered into by the parties pursuing an interest of their own, whether they act in their own name or through a legal or conventional representative or agent {or in the several qualities they assume). This article has no equivalent in the French Civil Code, but principal and accessory contracts are familiar names in French doctrine. However, French writers have sometimes handled this classification as a subdivision of another one, namely, dependent and independent contracts. Such an idea lends itself to some confusion, but fortunately there is no room for it in the Louisiana Civil Code. As it will be remembered from the discussion above, the idea of dependent or independent contracts is connected with a relation of reciprocity — commutative contracts — in the Louisiana law, and not with a relation of accessoriness. This should be remembered any time that, as a matter of language convenience, it is said that an accessory contract ‘depends’ on the principal one. [Bolding added.] [Footnotes omitted.]
(The substance of former La.C.C. art. 1771 is now found in La.C.C. art. 1913 per Act 331 of 1984, effective January 1, 1985.)
*933 Contracts of suretyship are interpreted pursuant to the same rules as are contracts in general. Ferrell v. South Central Bell Telephone Co., 403 So.2d 698 (La.1981). Those rules are found in La. C.C. arts. 2045-2057; Some of these rules are set forth in Soverign Insurance Company v. Texas Pipe Line Company, 488 So.2d 982, 984 (La.1986), as follows:
Interpretation of a contract is the determination of the common intent of the parties_ When the words of a con-ti’act are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent.... Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.
Also, La.C.C. art. 2053 provides as follows:
A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.
Our review of the contract herein indicates it was the intent of the parties to establish a business relationship between each other which would govern future business transactions between them. See, for example, First National Mortgage Corporation v. Manhattan Life Insurance Company, 360 So.2d 264 (La.App. 4th Cir.1978). Since the parties to the contract were “pursuing an interest of their own”, and since the entire contract “stands on its own”, the entire contract is a principal contract and not an accessory one.
Paragraph 7(e) is an integral part of the reciprocal rights and obligations of the parties to this principal contract. In this posture, if paragraph 7(e) is an accessory promise, it is accessory to the First Federal-Quirk Ford contract of December 14, 1982; paragraph 7(e) is not accessory to the Quirk Ford-Thomas contract of July 2, 1983, or the Quirk Ford-Kelly contract of July 7, 1983. In any event, the specific language of paragraph 7(e) shows it was not the intent of the parties to create a suretyship. Paragraph 7(e) requires Quirk Ford to purchase a vehicle from First Federal on the date of delivery of the vehicle[1] by First Federal to Quirk Ford for a purchase price of the balance due on the consumer credit contract for the vehicle, and then only if the first three installments on the contract have not been paid by the debtor. A sale of a vehicle by First Federal to Quirk Ford clearly contemplates that First Federal has acquired ownership of the vehicle from the debtor in some manner; [2] otherwise, First Federal could not convey title. Thus, the agreement is that Quirk Ford (the original seller) will purchase the vehicle {the security for the loan) from First Federal (the lender) in the limited circumstances set forth in the agreement. It is significant that the First Federal-Quirk Ford agreement specifically requires Quirk Ford to assist First Federal in the collection of any contract transferred to First Federal, but does not impose a reciprocal obligation by First Federal to involve Quirk Ford in the collection process.
Suretyship cannot be presumed and should be expressed. La.C.C. art. 3039. We do not equate the word “recourse” used in paragraph 7(e) with surety-ship. For example, in paragraph 1 of the contract, Quirk Ford “fully guaranteed” contracts of its “employees or relatives.” For this reason and for the reasons heretofore set forth, we conclude that paragraph 7(e) does not make Quirk Ford a surety for the Thomas and Kelly debts. Thus, Quirk Ford’s obligation to First Federal cannot be extinguished on a theory of impairment of subrogation rights.[3] La.C.C. art. 3061. *934 Paragraph 7(e) is a part of an innominate contract[4] and exists independently from the Thomas and Kelly contracts.[5] (This contract is not an agreement to sell as defined in La.C.C. art. 2462 because First Federal is under no binding obligation to buy.) This innominate contract is only subject to the general principles of the law of contracts and is not subject to the special rules governing suretyship. The result reached by the trial court is correct.
This assignment of error is without merit.
DECREE
For the foregoing reasons, the judgment of the trial court is correct and is affirmed at the appellant’s costs.
AFFIRMED.

. Since delivery of the vehicle is one of the requirements for triggering Quirk Ford’s obligation under paragraph 7(e), it would seem that failure to deliver the vehicle by First Federal (for example, the debtor absconds with it) will defeat a claim by it.

. The contract places no limits on how First Federal acquires ownership of the vehicles.

. Since Quirk Ford’s obligation under paragraph 7(e) is only triggered (among other ways) by delivery of the security, even if it was a surety, it would seem that its obligation was at *934 least for the actual value of the vehicle (security) under a pro tanto discharge. Pontchartrain Apartments v. Maryland Casualty Co., 171 La. 67, 129 So. 671 (1930).

. The distinction between nominate and inno-minate contracts is set forth in S. Litvinoff, 6 Louisiana Civil Law Treatise, Obligations § 113, pp. 197-198 (1969) as follows:
In the civilian tradition, nominate, or named contracts are those which are subject to a special and detailed regulation contained in the civil code, such as the contracts of sale, or lease. Innominate, or unnamed contracts are those which are subject only to the general principles of the law of contracts. Thus, the distinctive feature of innominate contracts is the absence of a special regulation, as is the case with the contract of nonmaritime insurance in France, which has not been regulated in the Code Napoleon. This tradition is reflected in article 1777 of the Louisiana Civil Code: 'Contracts in general, under whatever denomination they may come, and whether they may or may not be included in any of the above divisions, are regulated by certain rules, which are the subject of this title.’ The article 1778 completes the idea in the following words: ‘Certain contracts are regulated by particular rules which are established in the parts of the Code which treat of those contracts.’ [Footnotes omitted.]
The substance of former La.C.C. arts. 1777 and 1778 is now found in La.C.C. arts. 1915 and 1916 per Act 331 of 1984, effective January 1, 1985.

. Since Quirk Ford’s obligation under paragraph 7(e) exists independently from the Thomas and Kelly obligations, the extinguishment of the Thomas and Kelly obligations by failure to comply with the Louisiana Deficiency Judgment Act, La.R.S. 13:4106-4107, will not affect the viability of the paragraph 7(e) obligation.